Kelly H. Macfarlane 5213
KELLY H. MACFARLANE, PLLC.
205 26th St. Suite 21
Ogden, Utah 84401
Telephone: (801) 364-3724
Facsimile: (801) 315-1104
kelly@macfarlanelegalworks.com
*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF UTAH

| | | |
|---|---|---|
| ASHLEE M. LOOSLE, | ) | CIVIL DIVISION |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO.: _____ |
| v. | ) | |
| | ) | |
| GENERAL MOTORS, L.L.C., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff, Ashlee M. Loosle, and the law firm of Kelly H. Macfarlane, PLLC., and files the following Complaint and in support thereof avers as follows:

## PARTIES

1. Plaintiff, Ashlee M. Loosle is a citizen of the State of Utah, Salt Lake County and currently resides in Sandy, Salt Lake County, Utah..

2. Defendant, General Motors, L.L.C. ('•GM"), is a Delaware limited liability company doing business throughout the United States with its principal place of business at Detroit, Michigan GM engages in business within the State of Utah and is

the successor corporation to General Motors Corporation (' GMC"). After the latter's bankruptcy and through an asset sale from GMC to GM, GM assumed the liabilities of GMC as set forth herein.

## JURISDICTION

3.      Plaintiff Ashlee M. Loosle was at all times relevant to this complaint, a citizen of the State of Utah - Defendant GM is a citizen of the State of Delaware with its principal place of business in the State of Michigan. This Court thus has original subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 (diversity), 18 U.S.C. § 1964-{c) and 28 U.S.C. § 1367 (ancillary jurisdiction). The amount in controversy without interest and costs, exceeds the sum or value specified by 28 U.S.C. § 1332, i.e., $75,000.00.

4.      Venue is proper in this District in that GM is subject to personal jurisdiction in this District and a substantial part of the events giving rise to this claim occurred within this District.

## FACTS

5.      On June 3, 2020, Ashlee M. Loosle, was driving her 2013 Chevrolet Spark on 11th Avenue in Salt Lake City next to a cemetery on her way to visit a friend.

6.      The 2013 Chevrolet Spark had been purchased in 2016 from Larry H. Miller Used Car Supermarket in Sandy, Utah by Plaintiff.

7.      The 2013 Chevrolet Spark was driven by Plaintiff for about 3 years until the date of the loss and on occasion had the car turn off to the ACC position when she would drive into her driveway and the low lip of the curb would jostle the key to the off position.  She took the vehicle to her authorized dealer and was told they could find nothing wrong with the ignition or the car .

8.      The 2013 Chevrolet Spark was equipped with an automatic transmission.

9.      Plaintiff was about 5' 2" tall and weighed approximately 120 pounds.

10.   On June 3, 2020, Ashlee was operating the 2013 Chevrolet Spark West on 11th Ave. next to the Salt Lake City Cemetery at about 11:50 p.m. when she approached an intersection with the configuration of a ''T'' with her roadway turning slightly left.

11.   Ashlee was operating the vehicle at or below the speed limit and was wearing her shoulder/lap belt.

12.     As she approached the turn in the roadway at the T intersection, the 2013 Chevrolet Spark went out of control and crashed into a light pole located on the south side of south side of 11th Avenue.

13.     Because of the defects alleged herein, the key in the 2013 Chevrolet Spark turned from the on position, to accessory/off position 3 or more seconds before the crash, causing the engine to shut off.

14.     As a result of the engine shutting down, Ashlee lost control of the 2013 Chevrolet Spark which traveled across the roadway on 11th Avenue to her left, failed to negotiate the turn and collided with the light pole on her left-hand side.

15.     Because of the additional defects set forth herein, the airbags located in the 2013 Chevrolet Spark failed to deploy at the appropriate time of the crash and the seat belt also allowed Ashlee to be thrown forward into the windshield causing her to go unconscious until police arrived.

16.     Ashlee suffered a traumatic brain injury during the crash and continues to suffer from effects of the head injury. She also cut her wrist and had dashboard knee, sprained ankle from trying to brake and compression fractures to her thoracic spine at T3-T5, with up to 35% compression of the vertebrae.

17.     As early as 2004, GM engineers determined that the type of ignition switch used on 2006 Saturn Ion's like that involved in this crash was so weak and positioned so low on the steering column that the driver's knee could easily bump the key and turn off the engine.

18.     GM also recognized that the position of the ignition switch was such that any key chain or other device hanging from the key could be caught between the driver's knee and the steering column, also causing the key to move from the run to accessory/off position stopping the engine.

19.     The ignition in the 2013 Chevrolet Spark also has a detent torque that is so low that the key can readily be inadvertently turned from the run to the accessory/off position. (Detent torque refers to the amount of force required to overcome the resistance built into the ignition switch to move the key from run or on to the accessory or off position).

20.     The low detent force and correspondingly low contact force required to inadvertently turn the key on the 2013 Chevrolet Spark from run to accessory/off was known in 2003 - years before the subject vehicle was manufactured and nearly two decades before the crash in this case.

21.     During development and testing of the 2013 Chevrolet Spark GM learned that engines were being shut down during operation as the result of defects in the key/ignition system. Nonetheless, no action was taken to correct this dangerous defect.

22.     By 2004, as set forth above, GM engineers had recognized that the ignition switch detent force on the 2013 Chevrolet Spark and other models was so weak and was placed in such

a vulnerable position that in January 2004 as part of its evaluation program an engineer employed by Defendant GM stated in reference to the ignition switch and its placemen that: "[t]his is a basic design flaw and should be corrected if we want repeat sales."

23. Notwithstanding its growing knowledge of the sinister nature of the ignition switch and key arrangement in the 2013 Chevrolet Spark, GM began manufacturing and selling the Chevrolet Cobalt with an identical key system first used in the 2005 Chevrolet Cobalt.

24. In 2004, one of GM's employees, Gary Altman, its Program Engineering Manager for the Cobalt, test drove a 2005 Cobalt with the standard key and key fob and during the test drive, Altman's knee bumped the key, the engine turned off and caused the vehicle to stall - this incident was reported by Altman to Defendant GM on or about October 29, 2004.

25. Altman's report led to an investigation referred to within GM as a Problem Resolution Tracking System inquiry (PRTS) - the description of the complaint that occasioned the PRTS was that "the vehicle can be keyed off with knee while driving."

26. On February 1, 2005, as part of the PRTS, GM engineers concluded:

There are two main reasons that lsic] we believe can cause a lower effort in turning the key: 1 . A low torque detent in the ignition switch. 2. A low position of the lock module in the column. (PRTS - Complete Report Nl724-04).

27. By early 2005, GM engineers concluded that both the position and the low torque detent in the ignition switch allowed the key to be shut off, disabling the engine, with little effort.

28. As a result GM engineers began examining ways to prevent the key in the 2013 Chevrolet Spark and Chevrolet Cobalt from being moved from the run to accessory/off position.

29. GM's engineers determined that the only sure solution to fix the problem of inadvertent key contact required changing the key mount from a low to a high position, which

would almost eliminate the possibility of the key or fob being inadvertently contacted by a driver.

30.	In addition, GM engineers determined that additional detent force would be required to ensure that the key or key fob was not inadvertently moved even in the high mount position to accessory or off by a driver.

31.	This sure and safe solution proposed in 2005 – w e l l  before the vehicle which injured Ashlee was manufactured,  was rejected in part because the cost to GM to implement the solution would be too high.

32.	GM also considered modifying the opening in the top of the key from a slot (its original configuration) to a very small hole, an effort to change the leverage exerted on the key and an attempt to prevent a key fob from hanging low enough to contact a driver's knee during normal operation.

33.	Although this supposed cure would not be a total solution to the problem, it would eliminate some risk and reduce the chance of inadvertent key movement from run to the accessory/off position.

34.	The cost for implementing this solution was less than $1.00 per vehicle but was rejected by GM along with the other measures to correct this dangerous problem because "none of the solutions represents an acceptable business case" - in short, GM rejected every solution including that of simply changing the key to save money and allow literally millions of persons to be exposed to needless danger:

> Per GMXOOl GM's [Gary Altman] directive we are closing this PRTS with no action. The main reasons are as following: All possible solutions were presented to CPIT and VAPIR: a. The lead-time for all solutions is too long. b. The tooling cost and piece price are too high. c. None of the solutions seem to fully countermeasure the possibility of the key being

turned (ignition turn off) during driving, Thus none of the solutions represents an acceptable business case. (emphasis added)

35.     In February 2005, GM alerted its dealers, but never Ashlee Loosle, r the public in general of the risk created by the position of the key switch on the steering column of 2005 Chevrolet Cobalts and 2005 Pontiac Pursuits (the Canadian version of the Pontiac GS) or any of the 2014 or earlier Chevrolet Spark.

36.     The February 2005, bulletin addressed the potential for drivers of these vehicles to inadvertently turn off the ignition due to low key ignition cylinder torque effort – Ashlee's 2013 Chevrolet Spark had the same safety related defects.

37,     ln the February 2005, bulletin, GM provided the following recommendations/instructions to its dealers - **but not to Plaintiff or the public** in **general:**

> There is potential for the driver to inadvertently turn off the ignition due to low key ignition cylinder torque/effort. The concern is more likely to occur if the driver is short and has a large heavy key chain.
>
> In the cases this condition was documented the driver's knee would contact the key chain while the vehicle was turning. The steering column was adjusted all the way down. This is more likely to happen to a person that is short as they will have the seat positioned closer to the steering column.
>
> In cases that fit this profile, question the customer thoroughly to determine if this may the cause. The customer should be advised of this potential and to take steps, such as removing unessential items from their key chains, to prevent it.
>
> Please follow this diagnosis process thoroughly and complete each step. If the condition exhibited is resolved without completing every step, the remaining steps do not need to be performed.

38.     GM's knowledge of this condition and the circumstances under which it could occur was concealed from Chevrolet Spark owners and operators including Ashlee Loosle.

39.     GM also failed to advise the public, its dealers, or its customers of the dangers that then existed with the Chevrolet Spark and instead concealed the defect and its

corresponding dangers from not only its own dealers but the public at large and all Chevrolet Spark owners and operators, including Ashlee Loosle, although GM was well aware that the Chevrolet Spark suffered from the same safety defects related to the key and ignition switch function and placement.

40.    49 C.F..R. § 573.6 requires; *inter alia,* that automobile manufacturers furnish a report to the NHTSA (National Highway Transportation Safety Administration) for each defect ...  related to motor vehicle safety."

41.    At the latest, by February 2005 GM had a legal duty as set forth above to disclose the safety related defects that existed in the Chevrolet Spark and Chevrolet Cobalt vehicles to the NHTSA (National Highway Transpm1ation Safety Administration).

42.    This legal duty was ignored by GM who instead elected to fraudulently conceal the defect existing in the key and ignition switch function and placement from the public, including the Plaintiff.

43.    GM not only concealed the existence of this defect from the public, it continued to manufacture and sell Chevrolet Spark and Cobalts with the same safety defects; including the 2013 model year vehicle that Ahlee was operating at the time of her brain injury, back injuries and other injuries described below.

44.    In March of 2005, Jack Weber, a GM engineer, in response to a customer complaint, tested a Chevrolet Cobalt with the same ignition mechanism Ashlee was operating at the time of her crash - Mr. Weber's investigation as set forth in an email stated:

> I've had a chance to drive a Cobalt and attempt to turn off the ignition during heel/toe down shifting. Much to my surprise. the first time I turn it off the ignition switch was during a normal traffic brake application on I-96. After that I was able  to do a static reproduction of the condition in a parking lot. See attached photos of the condition with comments. My Anthropometric Measurements are attached below:

> Attached below is documentation of a RAMSIS study performed to attempt to duplicate the real world condition.
>
> Please call at (586) 986-#### with questions.
>
> Jack Weber (emphasis supplied)

45.    Despite clear evidence of dangerous defects existing within the key and ignition switch system as of March 2005, GM did not elect to adopt any of the proposed solutions broached earlier and instead chose to simply advise customers to remove excess materials from their key rings.

46.    GM knew that removal of excess material from key rings alone would not remedy the dangerous defect existing within the key and ignition switch system and indeed their own analysis had fully revealed the same.

47.    In response to a second complaint in May of 2005, GM decided to redesign the key to now reduce the possibility of inadvertent transfers of the key in the Saturn Ion and sister vehicles from the run to the accessory/off position during driving.

48.    Notwithstanding their apparent decision to adopt this change, GM never followed through and in fact never modified the key design nor informed the public, including the Ashlee Loosle of the vehicle's serious and ever present safety risk.

49. A 2005 statement by Alan Adler, GM's Manager, Production Safety Communications, issued a statement as to the Chevrolet Cobalt's tendency to experience an engine shut down during normal operation which was clearly and materially false and misleading - the statement is as follows:

> In rare cases when a combination of factors is present, a Chevrolet Cobalt driver can cut power to the engine by inadvertently bumping the ignition key to the accessory or off position while the car is running.
>
> When this happens the Cobalt is still controllable. The engine can be restarted after shifting to neutral.
>
> GM has analyzed this condition and believes it may occur when a driver overloads a key ring, or when the driver's leg moves amid factors such as steering column position, seat height and placement. Depending on these factors, a driver can unintentionally turn the vehicle off.
>
> Service advisers are telling customers they can virtually eliminate this possibility by taking several steps, including removing non-essential material from their key rings.
>
> Ignition systems are deigned to have "on" and "off" positions; and practically any vehicle can have power to a running engine cut off by inadvertently bumping the ignition from the run to accessory or off position.

50. Adler's and GM's statement set forth above is completely belied by the experience GM had already at that point, including the operation of a vehicle by its own engineers which demonstrated that removing materials from key rings alone would not eliminate or even virtually eliminate the risk of the engine shutting down during normal operation.

SI. ln July 2005, a 16 year old girl operating a 2005 Cobalt was killed when she drove off the road and struck a tree - her driver;s side airbag did not deploy and she died from injuries sustained in the crash.

52.     GM received notice of this event and began an internal investigation and determined that at the time of the crash, the Cobalt's key was in the accessory/off position and that the driver's side front airbag should have deployed but did not.

53.     The operator of that vehicle, Amber Rose, by and through her estate, is believed to have entered into a confidential settlement agreement with GM.

54.     Another damning email was authored by John Hendler, a GM engineer, in September of 2005 which provided as follows:

> I wanted to close the loop on the Electrical SMT's attempt to bring a new ignition switch design to the Delta/Kappa vehicles for MY 08. As the VSE for the Cobalt launch l am very aware of an issue with "inadvertent ignition offs[1] due to the low mounted ignition in the steering column and the low efforts required to rotate the ignition.
>
> A new, more robust, increased effort design is currently being implemented on the GMT 191 program of MY 07. My intention was to bring this part number common design to the Delta/Kappa vehicles for MY08. I attended an X Vapir with the Delta team to review the pros/cons of this change. The con of the change ls that the piece cost of the ignition switch went up around $0.90 and would require $400K in tooling to add the almost 5OOK in volume.
>
> At the X Vapir my team was challenged to offset the piece cost with warranty savings and/or reduced PC/Inv, I worked through Purchasing with Stoneridge Poliak to gain the reductions. Stoneridge Poliak was unwilling to budge on their PC/Inv. The warranty offset for the new switch is in the $0.10 - 0.15 range.
>
> It was felt by the Delta team that the revision of the slot in the ignition key to a hole would significantly reduce the inadvertent offs and make any additional changes.
>
> Consequently , the ignition switch for the Deltas and Kappas will remain the carryover single detent switch until the piece cost hit can be eliminated or significantly reduced. My plan is to resource this switch design for MY 09 and make it available for the Deltas Kappas, and the 19X families.

55.     This email demonstrates GM's knowledge as of September 28, 2005 that the ignition keys in the Chevrolet Spark and other related vehicles were being turned off because of their

location and the low detent force required - that it recognized the need to change the system but refused to do so until the cost could be absorbed.

56.    In December of 2005, GM issued Technical Service Bulletin (TSB) 05-02-35-007.

57.    The TSB which GM represented applied to *inter alia,* 2003 - 2006 Saturn Ions provided, 'Information on inadvertent Turning of Key Cylinder, Loss of Electrical System and no DTCs'' and provided in pertinent part as follows:

> There is potential for the driver to inadvertently turn off the ignition due to low ignition key cylinder torque/effo1t.
>
> The concern is more likely to occur if the driver is short and has a large and/or heavy key chain. In these cases, this condition was documents and the driver's knee would contact the key chain while the vehicle was turning and the steering column was adjusted all the way down. This is more likely to happen to a person who is short, as they have the seat positioned closer to the steering column.
>
> In cases that fit this profile question the customer thoroughly to determine if this may the cause, The customer should be advised of this potential and should take steps to prevent it - such as removing unessential items from their key chain.
>
> Engineering has come up with an insert for the key ring so that it goes from a "slot" design to a hole design. As a result, the key ring cannot move up and down in the slot any longer - it can only rotate on the hole. In addition, the previous key ring has been replaced with a smaller, 13 mm (0.5 in) design. This will result in the keys not hanging as low as in the past.

58.     The referred to change from a "slot" design to a "hole" design is illustrated below.



59.     Like its predecessor statements regarding the defective vehicles, the information provided in this TSB was false and misleading.

60.     GM's technical statements issued before the TSB never represented that short drivers or heavy key chains were the causes for the incidents that were occurring in the vehicles.

61.     Instead, at the time the TSB was issued, GM knew that inadvertent transfers of the key in the involved vehicles from the run to the accessory/off position were being experienced by drivers of all sizes using keys with standard key fobs.

62.     GM, in other words, knew the incidents were not caused by short drivers with heavy key chains but instead were the result of the safety related defects in the key/ignition system of, *inter alia,* the Chevrolet Spark.

63.     Although GM never made the public aware of this activity, it had begun purchasing back Cobalts from certain customers who were experiencing engine stalling incidents as early as 2005 - some vehicles were purchased back by GM from the customers while others who had also experienced stalling incidents did not have their cars repurchased by GM and in

fact, many of the customers who experienced engine stalling incidents were never informed by GM of the existence of or the availability of the key insert described above - neither Ashlee nor any owner or other operator of the Chevrolet Spark involved in this occurrence was advised of the buy- back arrangement GM had made with some Cobalt and other sister cars owners because of the ignition defect which is the subject of this lawsuit.

64.     On November 17, 2005, an incident occurred in Baldwin, Louisiana involving a 2006 Chevrolet Cobalt which left the road and struck a tree. The frontal air bags did not deploy in this collision and GM, after receiving notice of the occurrence, referred to it as the "Colbert" incident.

65.     On February 10, 2006, a 2005 Chevrolet Cobalt flew off the road and struck a light pole in Lanexa, Virginia - as in the Colbert incident described above) the frontal airbags failed to deploy and the download of the SOM (so-called "black box") showed that the key was in the accessory/off position at the time of the crash - after receipt of notice of this occurrence GM opened a file and referred to as the "Carroll" incident.

66.     In Frederick, Maryland on March 14, 2006, yet another 2005 Chevrolet Cobalt traveled off the road, struck a utility pole with non-deployment of the frontal airbags - the download of the SDM in this crash showed that the key was in the accessory/off position - GM referred to this as the "Oakley" incident.

67.     In February 2014, Defendant GM wrote to NHTSA regarding Recall No. 13454 and acknowledged for the first time that changes had been made to the ignition switches in the defective vehicles for and during the 2007 model year.

68.	GM's letter represented that on April 26, 2006, the GM design engineer responsible for the Chevrolet Cobalt ignition switch signed documents approving changes to the ignition switch proposed by the supplier, Delphi Mechatronics.

69.	GM also related that changes incorporated and approved by GM in 2007 included the use of a new detent plunger and spring that increased the torque force in the ignition switch the GM design engineer identified by GM in the 2014 letter was Ray DeGiorgio.

70.	Mr. DeGiorgio did in fact execute a "General Motors Commodity Validation Sign-Off" dated April 26, 2006 approving the ignition switch change referred to above yet at no time prior to February 24, 2014 did GM disclose to the driving public or anyone for that matter that the ignition switch had been changed in an effort to address the obvious defect that existed.

71.	On August l, 2006, GM opened another PRTS following a customer complaint about a Chevrolet Cobalt's stalling while driving but closed this PRTS on October 2; 2006 without taking any action.

72.	In October of 2006, GM also updated TSB 05-02-35 007 to include the following model years: 2007 Saturn Ion and Sky, 2007 Chevrolet HHR, 2007 Chevrolet Cobalt and 2007 Pontiac Solstice and GS - these vehicles had the same safety related defects in the key system as the vehicles in the original TSB.

73.	On December 29, 2006 in Sellenville, Pennsylvania; a 2005 Chevrolet Cobalt left the roadway and struck a tree with frontal airbag non-deployment - GM upon receipt of notice of this incident, opened a file referring to it as the "Frei" incident.

74.	On February 6, 2007, in Shaker Township, Pennsylvania, a 2006 Chevrolet Cobalt left the roadway and struck a truck with frontal airbag non-deployment - the download of

the SDM showed the key was in the accessory/off position and upon notice of this incident, GM opened a file referring to it as the "White" incident.

75. In August of 2007; GM met with its Sensing and Diagnostics Module (SOM) supplier, Continental, to review SOM data from a crash of a 2005 Chevrolet Cobalt where the airbags failed to deploy.

76. On August 6, 2007, in Cross Lanes, West Virginia, a 2006 Chevrolet Cobalt rear-ended a truck with frontal airbag non-deployment - upon notice of this incident, GM opened a file referring to it as the "McCormick" incident.

77. In September 2007; the Chief of the Defect Assessment Division within the Office of Defects Investigation ("OD1") of the NHTSA emailed other OD1 officials and proposed an investigation of "frontal air-bag non-deployment (sic) in the 2003 - 2006 Chevrolet Cobalt/Saturn Ion." This email went on to state that that the:

> ... issue was promoted by a pattern of reported non-deployments in VOQ [Vehicle Owners' Questionnaire] complaints that was first observed in 2005. Since that time, [the Defects Assessment Division] has followed up on the complaints, enlisted the support of NCSA 's Special Crash Investigation (SCI) team, discussed the matter with GM, and received a related EWD Referral. Notwithstanding GM's indications that they see no specific problem pattern, DAD perceives a pattern of non-deployments in these vehicles that does not exist in their peers....

78. The foregoing email shows that as of September 2007, GM was deliberately misleading the NHTSA and its office of defects investigators as to the pattern of and existence of defects existing in the key system of the vehicles referred to above - a clear violation of federal law.

79. On September 25, 2007, in New Orleans, Louisiana, a 2006 Chevrolet Cobalt lost control and struck a guardrail with frontal airbag non-deployment GM received notice of this incident and opened a file referring to it as the "Gathe" incident.

80.     On October 16, 2007, in Lyndhurst, Ohio, a 2006 Chevrolet Cobalt traveled off the road and struck a tree with frontal airbag non-deployment - GM received notice of this incident and opened a file referring to it as the "Breen" incident.

81.     On April 5, 2008, in Sommerville, Tennessee, a 2006 Chevrolet Cobalt traveled off the road and struck a tree with frontal airbag non-deployment -- a download of the SDM showed the key was in the accessory/off position - GM received notice of this incident and opened a file referring to it as the "Freeman" incident.

82.     On May 21, 2008, in Argyle, Wisconsin, a 2007 G5 traveled off the road and struck a tree with frontal airbag non-deployment - a download of the SDM showed the key was in the accessory/off position - GM received notice of the incident and opened a file referring to it as the "Wild" incident.

83.     On May 28, 2008, in Lufkin, Texas, a 2007 Chevrolet Cobalt traveled off the road and struck a tree with frontal airbag non-deployment GM received notice of the incident and opened a file referring to it as the "McDonald" incident.

84.     On September 13, 2008, in Lincoln Township, Michigan, a 2006 Chevrolet Cobalt traveled off the road and struck a tree with frontal airbag non-deployment - GM received notice of the incident and opened a file refering to it as the 'Harding" incident.

85.     On November 29, 2008, in Rolling Hills Estates; California, a 2008 Chevrolet Cobalt traveled off the road and struck a tree with frontal airbag non-deployment . GM received notice of the incident and opened a file referring to it as the "Dunn" incident.

86.     On December 6, 2008, in Lake Placid, Florida, a 2007 Chevrolet Cobalt traveled off the road and struck a utility pole with frontal airbag non deployment - a download of the

SDM showed the key was in the accessory/off position - GM received notice of the incident and opened a file referring to it as the "Grondona" incident.

87.     In February of 2009, GM opened yet another PRTS with respect to the defective vehicles - this time to investigate why the slot in the key for the Chevrolet Cobalts allowed the key chain to hang too low in the vehicles as well as the inadvertent shutting off of the vehicles.

88.     Through this PRTS, GM determined that changing the key from a slot to a hole would significantly reduce the likelihood of inadvertent transfer of the key from the ignition to the accessory/off position.

89.     In March of 2009 GM approved the design change in the key from the slot to a hole and this redesigned key was to have been implemented in 2010 model year Chevrolet Cobalts.  However GM chose not to provide these redesigned keys to owners or lessees of any of the vehicles previously identified as being implicated in the TSB, including the Chevrolet 2013 Spark operated by Ashlee.

90.     The following provides a short overview of important events between 2004 and the present as *set* forth above:

| 2001-2004 | 2010-2014 |
|---|---|
| GM becomes increasingly aware of and informed that key and ignition systems in the involved vehicles are defective | GM learns of more field reports of key system failures and more fatalities |

| 2005 | 2005-2009 | 2009 | 2013 | 2014 |
|---|---|---|---|---|
| GM engineers proposed fix which is rejected by GM | GM becomes aware of hundreds of field reports of key system failures and multiple fatalities | GM declares and emerges from bankruptcy. | GM manufactures the 2013 Chevy Spark eventually purchased by Ashlee. | GM issues recall (inadequate) more than 10 years after becoming aware of the key/ignition system defects in its vehicles including many similar models to Ashlee's car. |

91.     Throughout the entire time period described in the foregoing illustration, GM was selling defective vehicles to consumers for full price and consumers were purchasing them

believing that the vehicles were not defective when all the while GM concealed the extent and nature of the defects in the various vehicles.

92.     Prior to its 2009 bankruptcy, GM's Chevrolet website stated as follows:

**OUR COMMITMENT**

Your family's safety is important to us, Whether it's a short errand around town or a cross-country road trip, <u>Chevrolet is committed to keeping YOU and your family safe-</u> from the start of your journey to your destination. That's why <u>every Chevrolet is designed with a comprehensive list of safety and security features</u> to help give you peace of mind. Choose from the safety features below to learn more about how they work, and which Chevy vehicles offer them.

93.     GM's print ad campaign features advertisements which included statements like, "Find New Roads." and pushed the safety features of this new smallest car lineup.

94.     To increase sales then, GM represented to consumers that they and their families would be safe in its vehicles.

95.     When the time came for the company to act in accord with its statements, GM did not disclose its knowledge about the dangerous key/ignition system defects to its customers it indeed did not do so for more than a decade after it was aware that the defects not only existed but was causing injuries and death.

96.     GM's 2009 bankruptcy lasted about a week after which it emerged from bankruptcy - before and after the bankruptcy, its vehicles' ignition/key systems failed and continued to fail and post-bankruptcy GM, just like its predecessor, continued to conceal the truth from the United States government and the public.

97.     On May 16, 2009, GM met with Continental again and requested that Continental download SDM data from a 2006 Chevrolet Cobalt crash where the airbags had not deployed.

98.     On March 10, 2010, Brooke Melton was driving a 2005 Chevrolet Cobalt in Paulding County, Georgia, when her key moved from the run to the accessory/off position causing her engine to shut down - she lost control of the vehicle, traveled into an oncoming lane, collided with an oncoming car and was killed in the crash.

99.     On March 22, 2014, Ryan Jahr, a GM engineer, downloaded the SDM from Brooke Melton's Chevrolet Cobalt and the information showed that the key had turned from the run to the accessory/off position 3 to 4 seconds before the crash.

100.    On June 24, 2011, Brooke Melton's parents filed a lawsuit against GM.

101.    On December 31; 2010, in Rutherford County, Tennessee, a 2006 Chevrolet Cobalt traveled off the road and struck a tree and experienced frontal airbag non-deployment - the download of the SOM showed that the key was in the accessory/off position - GM received notice of this incident and opened a file referring to it as the "Chansuthus[0] incident.

102.    On December 31, 2010, in Harlingen, Texas, a 2006 Chevrolet Cobalt left the roadway, struck a curb and experienced an airbag non-deployment -- GM received notice of this incident and opened a file referring to it as the "Najera" incident.

103.    On December 18, 2014, in Parksville, South Carolina, a 2006 Chevrolet Cobalt left the roadway, struck a tree and experienced frontal airbag non-deployment - a download of the SDM showed the key was in the accessory/off position - GM received notice of this incident and opened a file referring to it as the "Sullivan" incident.

104.    These incidents are not limited to vehicles of model year 2007 and before - GM's own investigation revealed that there have been over 250 crashes involving 2008 to 2010

Chevrolet Cobalts in which airbags failed to deploy - the key system in the Chevrolet Cobalt is the same as that in the Chevrolet Spark in which Ashlee crashed.

105. A formal investigation of frontal airbag non deployment incidents was begun by GM in 2010 as to Chevrolet Cobalts and Pontiac GSs - this investigation was later elevated to a Field Performance Evaluation CFPE").

106. In August of 2011, GM assigned Engineer Group Manager, Brian Stouffer (Stouffer), as the Field Performance Assessment Engineer C'FPAE").

107. In the spring of 2012, Stouffer asked Ashlee Federico ("Federico"), a high level executive and Chief Engineer at GM, to oversee the FPE investigation - Federico was the "Executive Championu for the investigation to help coordinate resources for the FPE investigation.

108. In May 2012, GM engineers tested the torque on the ignition switches from the 2005 2009 Chevrolet Cobalts, 2007, 2009 Pontiac GS, 2006 - 2009 HHR, and 2003 2007 Ion vehicles at a junkyard site - results of this testing showed that the torque required to turn the ignition switches in most of these vehicles from the run to the accessory/off position did not meet *GM's own* minimum torque specification requirements including the 2008 - 2009 vehicles. The results were reported to Stouffer and other members of the FPE,

109. In September 2012, Stouffer requested assistance from the "Red X Team[11] as part of the FPE investigation - the Red X Team was a group of engineers within GM assigned to find the root cause of the airbag non deployments in frontal crashes involving Chevrolet Cobalts and Pontiac G5s.

110.    By this time, however, it was clear that the root cause of the airbag non-deployment in a majority of the frontal crashes was the defective key system - the Red X Team became involved in the investigation shortly after Stouffer's request.

1 I 2.    During the FPE process, GM determined that although increasing the detent in the ignition switch would reduce the chance that the key would inadve1tently move from the run to the accessory/off position, it would not be a total solution to the problem.

113.    GM engineers in fact identified several additional ways to actually fix the problem which included adding a shroud to prevent a driver's knee from contacting the key, modifying the key and lock cylinder to orient the key in an upward facing orientation when in the run position and adding a push button to the lock cylinder to prevent it from slipping out of run•·· GM rejected each and every one of these ideas.

114.    The photographs below are of a GM engineer in the driver's seat of a Chevrolet Cobalt during the investigation of Cobalt engine stalling incidents.



1 15.    The photographs reveal the dangerous condition created by the position of the key in the lock module in the steering column of these vehicles as well as the key slot which allows the key fob to hang too low off of the steering column which in tum allows the key to be readily

transferred from the run to the accessory/off position especially given the low detent torque which is the static condition of the key while in the on position.

116. These pictures also illustrate why GM engineers understood that increasing the detent alone would never be a total solution to the problem and in fact recommended additional changes to ensure an arrangement which would prevent ongoing tragedies involving these vehicles.

117. GM continued to conceal the nature and extent of these defects from the public.

118. By 2012, more than a year before Ashlee's car was manufactured, Federico Stouffer and the remaining members of the Red X Team knew that the key system in the Saturn Ion, Chevrolet Cobalt and Pontiac G5s similar to Chevy Sparks, had safety related defects that would cause the key to move from the run to accessory/off position while these vehicles were being driven - they also knew that when this occurred, the airbags would no longer work in frontal crashes.

119. Federico, Stouffer and other members of the Red X Team also understood that these safety related defects had caused or contributed to numerous crashes and multiple fatalities and despite this knowledge, GM chose to conceal the information from Ashlee, the public and the NHTSA.

120. Under the provisions of 49 C.F.R. § 573.6, GM had a duty in 2012 to disclose the safety related defects in the Saturn Ion, Chevrolet Cobalt and Pontiac GS and Chevy Spark vehicles - rather than meeting their legal obligations, GM continued to fraudulently conceal these defects from the public and the United States government.

121. In the Melton litigation referred to above, GM representatives have admitted that vehicles which do not meet minimum torque requirements as to the ignition detent, should never have been sold •- this includes with similar ignitions to the Chevy Spark driven by Ahslee at the time

24

of this crash.

122. On February 7, 2014, GM in a letter from Carmen Benavides, Director -- Product Investigations and Safety Regulations for GM, informed NHTSA that it was conducting Recall No. 13454 for certain 2005 - 2007 model year Chevrolet Cobalts and 2007 model year Pontiac GS vehicles•- the recall was announced more than 10 years after GM became aware of the defect in these and other vehicles which led to the recall.

I23. In the foregoing recall letter, GM represented that as replacement ignition switches became available, GM would replace them on the defective vehicles.

124. On February 19, 2014, a request for timeliness query of General Motors' Safety Recall 13454 was sent to NHTSA - the timeliness query pointed out that GM had failed to recall all of the vehicles with the defective ignition switches.

125. The February 19, 2014 request for timeliness query also asked NHTSA to investigate GM's failure to fulfill its legal obligation to report the safety related defects tin the defective vehicles to NHTSA within five (5) days of discovery of the defect.

126. On February 24, 2014, GM sent a letter to Ms. Benavidees and informed NHTSA it was expanding the recall to include 2006 - 2007 Model Year (MY) Chevrolet IUIR and Pontiac Solstice, 2003 - 2007 MY Saturn Ion and 2007 MY Saturn Sky vehicles.

127. On March 28, 2014, GM again expanded the ignition switch recall to cover all MY's of the Chevrolet Cobalt and HHR, the Pontiac 05 and Pontiac Solstice and the Saturn Ion and Sky vehicles in the United States - according to reports, this second expansion of the ignition switch recall covers an additional 824,000 vehicle in the United States bringing the number of recalled vehicles to 2,191,146.

128. In February 2021, Ashlee Loosle received a an appointment reminder Riverton Chevrolet to bring her car in for an open recall for her 2013 Chevrolet Spark which included ignition rotation

defects that had been recalled even though they were not currently showing up on the manufacturer's website.

129.    Before Ashley purchased the car in 2016, a recall #14V298000 dated in 2014 indicated that an "improper weld in [her vehicle] the driver and passenger side front airbag inflater may result in the airbag not deploying or deploying late." Ashlee was never informed of this recall despite the fact that she owned this car purchased from a known Chevrolet Dealer (Larry H. Miller) without the recall having been remedied on her vehicle.

130.    The recalls are both tardy and entirely inadequate to eliminate or effectively correct the safety defects referred to above in the described vehicle.

131.    GM has known, and its internal documents reveal that, since at least 2005, that replacement of the ignition switches alone on the defective vehicles is not a complete solution to the risk of inadvertent key transfers from the run to the accessory/off position in the defective vehicles.

132.    Replacement of the ignition switch alone will not correct or eliminate the design defect that causes the key chain or fob to hang too low on the steering column.

133.    Even with replaced ignition switches, the foregoing defective condition would still exist and continue to allow potential inadvertent contact and the consequent transfer of the ignition key from the run to the accessory/off position.

134.    In addition, the contemplated recall does nothing towards replacing the defective keys in the defective vehicles with the key that has been redesigned with a hole instead of a slot that by its own admission GM contends would reduce the chance of inadvertent transfers of the key from the run to accessory/off position.

135.    Neither does the recall address the design defect in the vehicles involved which causes the airbag to be disabled immediately upon the engine shutting off.

136.    In spite of GM's contention that it changed and/or modified the ignition switches in some 2007 Chevrolet Cobalts, all of the 2008 - 2010 Chevrolet Cobalts produced non-deployment events continue to occur in the later model Chevrolet Cobalts GM's own investigation into non•deployment events of Chevrolet Cobalts has identified over 250 airbag non deployment crashes involving 2008 -2010 Chevrolet Cobalts these same issues are now be expanded to the Chevrolet Spark in notices that are just being issued to customers after 2020.

137.    As described above, GM's engineers have long understood that increasing the detent in the ignition switch in and of itself was not a solution to the problem but GM nonetheless concealed and continues to conceal from the public and the Plaintiff herein, the nature and extent of the key system defects which the current recall will not cure.


COUNT I – PRODUCT DEFECTSTRICT LIABILITY

138.    Plaintiff incorporates herein by reference A L L  Paragraphs of this Complaint as if fully set forth herein.

139.    Ashlee Loosle's 2013 Chevrolet Spark was dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that car in the community considering the car's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer.

140.    At the time the product was sold by the GM or other initial seller, there was a defect or defective condition in Ashlee Loosle's 2013 Chevrolet Spark which made the car unreasonably dangerous to the user or consumer.

141.    GM designed, selected, inspected, tested, manufactured, assembled, equipped, marketed, distributed and sold Ashlee Loosle's 2013 Chevrolet Spark and its components, including but not. limited to equipping it with the key/ignition system.

142.    GM designed, selected, inspected, tested, manufactured, assembled, equipped, marketed, distributed and sold the key/ignition system which was selected and installed in Ashlee Loosle's 2013 Chevrolet Spark.

143.    GM sold the 2013 Chevrolet Spark more than seven (7) years prior to the filing of this action, however, any stature of repose or limitation is tolled because of GM's fraud and fraudulent concealment and conduct equivalent to that required to impose punitive damages against GM.

144.    GM had a legal duty to design, inspect, test, manufacture and assemble the 2013 Chevrolet Spark so that it would be reasonably crashworthy and provide a reasonable degree of occupant safety in foreseeable collisions occurring in the highway environment of its expected use.

145.    The manufacturer - GM - of a product - the 2013 Chevrolet Spark - is a guarantor of its safety.

146.    Among other things, the 2013 Chevrolet Spark is not crashworthy, is defective and is unreasonably dangerous and unsafe for foreseeable users and occupants in each of the following particulars:

   a.    Having a key/ignition system that is inadequately designed and constructed and located which may result in the key moving from the run to the accessory/off position during normal driving operations and maneuvers;

b. Having a key/ignition system that allows the 2013 Chevrolet Spark to stall and/or lose engine power and steering and/or full braking ability while driving;

c. Having frontal airbags that do not deploy or deploy late when the key is in the accessory/off position; and

d. In failing to adequately warn Ashlee, other consumers or the public in general about the unsafe and defective *condition* and design of the vehicle known to GM so that an individual like Ashlee could make informed and prudent decisions about riding and/or traveling in or operating such vehicles;

147. The unreasonably dangerous condition of the 2013 Chevrolet Spark existed at the time the car left the control of GM.

148. The defective nature of the 2013 Chevrolet Spark which Ashlee was operating was the legal cause and a substantial factor in causing the damages sustained by Ashlee and her injuries as set forth herein, thus rendering GM strictly liable.

149. In the alternative; Plaintiff alleges the following elements of her strict product liability claim:

a. The design of the 2013 Chevrolet Spark was defective and unreasonably dangerous;

b. When the design was made, an alternative safer, economically feasible and practicable design, under the circumstances, existed;

c. Plaintiff would not have sustained severe injuries had an alternative, safer design, been used; and

d. Ms. Loosle's injuries were attributable to, and directly and extensively enhanced by, the defective design.

150. Ashlee Loosle has sustained the following damages proximately caused by the defective designs outlined above:

a. The cost of medical treatment, services, supplies, hospitalization, and all other medical costs incident to the treatment of Ashlee Loosle;

b.      For prejudgment interest on special damages as provided for by Utah law;

c.      Such other losses and damages as are recoverable by law or statute.

151.    GM's conduct was knowing, intentional, with malice, demonstrated a **complete** lack of care and was in reckless disregard for the rights of and in deliberate indifference to the well-being of Ashlee Loosle and others similarly situated such that punitive damages are warranted.

WHEREFORE, Plaintiff, Ashlee Loosle, hereby seeks damages in an amount in excess of the jurisdictional limits of this Court, as well as punitive damages.

## COUNT II - NEGLIGENCE

152.    Plaintiff incorporates herein by reference all Paragraphs of this Complaint as if fully set forth herein.

153.    Defendant, GM, by virtue of the acts and/or omissions as set forth herein, was careless, reckless and negligent in designing, inspecting, testing, manufacturing, assembling, marketing, selling and providing warnings for the 2013 Chevrolet Spark as set forth in the paragraphs above.

154.    GM's negligence was the legal cause of the damages sustained by the Plaintiff as set forth herein.

157, GM's conduct was knowing ,intentional with malice, demonstrated a complete lack of care and was in reckless disregard for the rights of and in deliberate indifference to the well-being of Ashlee Loosle and others similarly situated such that punitive damages are warranted.

WHEREFORE, Plaintiff, hereby seeks damages in an amount in excess of the jurisdictional limits of this Court, as well as punitive damages.

## COUNT III - BREACH OF IMPLIED WARRANTY

158. Plaintiff incorporates herein by reference all Paragraphs of this Complaint as if fully set forth herein.

159. GM breached its implied warranty of merchantability by selling the 2013 Chevrolet Spark when it was not fit for the ordinary purpose for which such goods are sold.

160. GM's breach of warranty was the legal and/or proximate cause of the damages suffered by the Plaintiff and the injures as set forth above.

161. GM's conduct was knowing, intentional, with malice, demonstrated a complete lack of care and was in reckless disregard for the rights of and in deliberate indifference to the well-being of Ashley Loosle and others similarly situated such that punitive damages are warranted.

WHEREFORE, Plaintiff, hereby seeks damages in an amount in excess of the jurisdictional limits of this Court, as well as punitive damages.

## COUNT IV - FRAUD AND FRAUDULENT CONCEALMENT

162. Plaintiff incorporates herein by reference all Paragraphs of this Complaint as if ful1y set forth herein.

163.     GM intentionally concealed material facts from Ashlee Loosle, the public and the NHTSA.

164.     GM knew that the defective vehicles including the 2013 Chevrolet Spark operated by the Plaintiff at the time of the crash were designed and manufactured with key/ignition system defects but GM concealed those material facts from the Plaintiff, the public, and NHTSA.

165.     Although the defective vehicles contained safety related defects that GM knew of years in advance of the manufacture of the 2013 Chevrolet Spark operated by Ashlee Loosle and many years in advance of the actual crash which ultimately injured her, GM recklessly manufactured and distributed the vehicles, including the 2013 Chevrolet Spark involved in this case, to consumers in the United States.

166.     The consumers had no knowledge of the safety related defects which the cars were subject to which GM knew or had reason to know of prior to the sale and manufacture of the 2013 Chevrolet Spark involved in this occurrence and many years prior to the crash in 2020 which injured Ashlee Loosle.

173,     GM had a duty to disclose the facts to Ashlee, and the public who owned defective GM cars and the NHTSA but failed to do so in each and every case.

174.     GM knew that Ashlee had no knowledge of those facts and she did not have an equal opportunity to discover the facts.

175.     GM was in the position of superiority as to Ashlee and indeed she trusted GM not to sell her a vehicle that was defective or violated federal law governing motor vehicle safety.

176.     Ashlee also further trusted GM to warn her of defects and recall defective vehicles as and when they became aware of the defects,

177.     By failing to disclose the material facts of which it was aware, GM intended to induce Ashlee to both purchase the 2013 Chevrolet Spark and/or continue to use and operate the

vehicle.

178.　GM further intended to induce the NHTSA to not recall the 2013 Chevrolet Spark owned by and operated by Ashlee as well as other defective vehicles in order to reduce its eventual financial exposure.

179.　Ashlee reasonably relied on GM's nondisclosure and reasonably but unknowingly continued to use the 2013 Chevrolet Spark until the date of the crash.

180.　Ashlee would not have purchased the 2013 Chevrolet Spark had she known of the defects in the key/ignition system and certainly would not have continued to drive the vehicle and would not have permitted Ashlee to operate it once they learned of the defect.

181.　GM reaped the benefit of the sales and leases of defective vehicles as a result of its nondisclosure to the pubic and to the NHTSA.

182.　Further, in failing to disclose the key/ignition system defects, GM helped prevent any meaningful investigation of many crashes that were likely the result of those defects.

183.　Further, because GM had not placed this matter before NHTSA or the public, cars and components in those similar wrecks were disposed of without the appropriate and adequate investigation.

184.　The injuries Ashlee were a direct and proximate result of the wrongful conduct and fraudulent concealment of the Defendant.

185.　As a direct and proximate result of GM's wrongful conduct and fraudulent concealment, the Plaintiff suffered the damages described herein.

186.　GM' s conduct was knowing, intentional, with malice, demonstrated a complete lack of care and was in reckless disregard for the rights of and in deliberate indifference to the wellbeing of Ashlee others similarly situated such that punitive damages are warranted.

WHEREFORE, Plaintiff, hereby seeks damages in an amount in excess of the jurisdictional limits of this Court, as well as punitive damages.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all counts and as to all issues.

Dated: June 3, 2022                    Respectfully Submitted,


KELLY H. MACFARLANE, PLLC.


*/s/ Kelly H. Macfarlane*_____

Kelly H. Macfarlane (Utah State Bar No. 05213)
205 26th Street, Suite 21
Ogden, Utah 84401
*Attorneys for Plaintiffs*